**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

| | | |
|---|---|---|
| **EAGLE RAILCAR** | § | |
| **SERVICES-ROSCOE, INC.,** | § | |
| | § | |
| **Plaintiff/Counter-Defendant,** | § | |
| | § | |
| **v.** | § | **No. 1:16-CV-0153-BL** |
| | § | |
| **NGL CRUDE LOGISTICS, LLC,** | § | |
| | § | |
| **Defendant/Counter-Plaintiff.** | § | |

## MEMORANDUM OPINION AND ORDER

The Court has under consideration NGL Crude Logistics, LLC's ("NGL")[1] Objection to and

Motion to Exclude Untimely Expert Designations and Opinions (doc. 43); Plaintiff Eagle Railcar

Services-Roscoe, Inc.'s ("Eagle")[2] Motion for Leave to File Third Party Complaint (doc. 47); and

Eagle's Motion to Compel and Motion for Sanctions (doc. 57). The motions are fully briefed and

ready for ruling.[3] After reviewing the briefing and applicable law, the Court **DENIES** the motions.

## I. BACKGROUND

Eagle commenced this action in state court in June 2016, seeking $49,541.08 in damages for

cleaning, servicing, maintaining, and/or repairing railcars for NGL. *See* Pl.'s Orig. Pet. (doc. 1-2).

An attachment to the complaint shows the damage computation resulting from twenty-one unpaid

invoices between December 2015 and February 2016. *See id.* (attachment to Pl.'s Orig. Pet.).

---

[1]At times, the Court may refer to NGL as "Defendant" or "Counter-Plaintiff."

[2]The Court may refer to Eagle as "Plaintiff" or "Counter-Defendant" as the circumstances warrant.

[3]For each motion, the parties file an appendix in support (docs. 44, 48, and 58), a response with supporting appendix (docs. 49-50, 53-54, and 61-62), and a reply brief (docs. 55, 56, and 63). Given the various filings, the Court will generally cite to them by document number. Because the appendices are consecutively numbered in the lower, right-hand corner, the Court will utilize those page numbers for its pinpoint cites to them.

NGL removed this action to federal court in August 2016. *See* Notice of Removal (doc. 1). That same day, it filed its Original Answer and Counterclaim seeking more than $1,000,000 in damages for three counterclaims: (1) breach of contract, (2) promissory estoppel, and (3) negligent misrepresentation based on an alleged oral agreement between the parties for Eagle to clean railcars at its Roscoe, Texas facility starting in October 2014. *See* Def.'s Orig. Answer & Counterclaim (doc. 1-2). It alleges that Eagle promised to complete the cleaning and return the railcars to NGL within thirty to forty days of approval of estimated cleaning charges – a process described as "turning." *See id.* Contemporaneously with the removal of this action, NGL filed (1) a Certificate of Interested Parties (doc. 1-3) that merely lists the parties and their attorneys and (2) a Corporate Disclosure Statement (doc. 2) that identifies its parent company as NGL Energy Operating, LLC.

The next month, Eagle filed its Original Answer to Defendant's Counterclaim (doc. 4). It asserted eight affirmative defenses: (1) accord and satisfaction; (2) waiver; (3) NGL consented to, approved, acquiesced in, and/or ratified the alleged conduct; (4) estoppel; (5) failure to mitigate damages; (6) excuse, justification, and/or privilege; (7) statute of frauds; and (8) absence of reasonable or justifiable reliance. Doc. 4 at 4.

Initially, this case proceeded fairly typically schedule-wise with the entry of a Pretrial Scheduling Order (doc. 10) on October 11, 2016, including setting a November 9, 2016 deadline for compliance with Fed. R. Civ. P. 26(a)(1); a March 1, 2017 deadline for seeking leave to amend pleadings and to add parties; and expert designation deadlines in April and May 2017. On December 5, 2016, NGL made initial disclosures, including (1) production of 697 pages of documents that it may use to support its claims and (2) identification of an Eagle representative, Adolf Deloera, and a NGL representative, Mitch Wood, as individuals likely to have discoverable information that NGL may

use to support its counterclaims. Doc. 50 at 1-3. These initial disclosures identified no affiliate or

parent company of NGL. *See id.* Nevertheless, NGL did produce a spreadsheet with the following

information: "HSCOM/NGL LEASE IDENTIFICATION"; Car Number; date cleaning was com-

plete; total days at ERSR;[4] days at ERSR after May 1, 2015; lease rates per day for each railcar both

before and after May 1, 2015; and claimed total extra lease payments incurred. *See* Doc. 54 at 18-20.

Ten listed railcars include a notation that they had been assigned to "Centennial." *See id.* at 19.

On April 11, 2017, the Court granted an agreed motion to extend deadlines. *See* ECF No.

18. Two weeks later, Eagle filed a notice of acceptance of an offer of judgment. *See* Doc. 19. The

next day, on April 26, 2017, NGL produced documents in response to Eagle's First Request for Pro-

duction. *See* Doc. 50 at 6-13. Eagle contends that the production consisted of approximately 6,500

pages and NGL is not identified within any produced document. *See* Doc. 49 at 3; Doc. 57 at 2. The

production, nevertheless, included the following agreements: (1) Car Leasing Agreement 9750-97

between General Electric Railcar Services Corp. ("GE Rail") and High Sierra Crude Oil and Market-

ing LLC ("HSCOM"); (2) Assignment, Assumption and Amendment Agreement among HSCOM,

GE Rail, and Centennial Energy LLC ("Centennial"); (3) Car Leasing Agreement 5942-97-0 between

GE Rail and Centennial; (4) Crude Rail Transportation Agreement between Green Plains Trade

Group LLC ("GPTG") and TransMontaigne Product Services, Inc.;[5] (5) Rider No. 1 to Master Rail

Car Lease and Service Contract No. L-1 between Transportation Equipment, Inc. and HSCOM; and

---

[4]Based on the context and the information before the Court, it appears that "ERSR" refers to the Eagle servicing center in Roscoe, Texas.

[5]Because other documentation reveals that TransMontaigne Product Services LLC is formerly known as Trans-Montaigne Product Services, Inc., *see* Doc. 50 at 23, the Court will hereinafter refer to the entity as "TransMontaigne."

(6) Rider No. 15 between First Union Rail Corp. ("First Union") and Gavilon, LLC ("Gavilon").[6]
*See* Doc. 50 at 14-19.

NGL designated its experts on May 3, 2017. *See* Doc. 21. On May 11, 2017, and pursuant to Fed. R. Civ. P. 54(b), the Court entered judgment in favor of Eagle for the full amount of its alleged damages, plus attorneys' fees and costs. *See* Agreed J. Pursuant to Rule 54(b) (doc. 23). The Court thus dismissed all claims asserted by Eagle with prejudice and recognized that NGL's counter-claims remain pending. *See id.*

On June 6, 2017, the Court granted a second agreed motion to extend deadlines and extended the deadline for rebuttal expert witnesses to June 30, 2017. *See* ECF No. 18. Eagle served its rebuttal expert disclosures on June 30, 2017. *See* Doc. 29. It therein identified an employee (Jaime Calfee) and officer (Marc Walraven) as experts under Fed. R. Civ. P. 26(a)(2)(C) not requiring a written report and an independent expert (Gary Hunter) under Fed. R. Civ. P. 26(a)(2)(B) who provided a written expert report. *See id.* It designated these experts to provide opinions about industry standards, whether damages to NGL were foreseeable, and the commercial reasonableness of "turn times" at the relevant Eagle facility in Roscoe. *See id.* Before stating his expert opinions in his written report, Hunter set out his background and experience, history of his fees and expert testimony in other cases, the documents he reviewed, and a factual history of this case. Doc. 44 at 4-7. He then opined that (1) no industry standard exists that governs turn times for railcar cleaning and repair, (2) Eagle's turn times were commercially reasonable under the facts of this case, and (3) NGL's claimed damages in this action could not have been reasonably foreseeable to Eagle. *See id.* at 7-9.

---

[6]In Eagle's proposed third-party complaint, it identifies Gavilon as an entity that changed its name to NGL Crude Logistics, LLC. *See* Doc. 48 at 2. In other words, Eagle seeks to name the current defendant/counter-plaintiff as a third-party defendant.

On July 20, 2017, the Court allowed Eagle to substitute counsel. *See* Order Granting Agreed Mot. to Substitute Counsel (doc. 31). Four days later, the Court granted an unopposed motion to amend the pretrial scheduling order. *See* ECF No. 33. It extended the discovery deadline to October 31, 2017, and the dispositive motion deadline to December 8, 2017. *See id.*

By email to NGL dated September 15, 2017, Eagle indicated that it wanted to file an amended answer and stated an anticipated need to depose representatives from non-parties GPTG; GE Rail; and Transportation Equipment, Inc. who are parties to subject sublease agreements or owners of the subject railcars. *See* Doc. 44 at 17. On September 20, 2017, NGL deposed Deloera. *See* Doc. 54 at 1. He testified about the seventy-one railcars at issue in this litigation and that he understood that Centennial sent some of them to the Roscoe facility. *See id.* at 4. He further testified about emails dated April 29, 2015, which reflect that Centennial informed Eagle that Centennial had assumed the lease on nine railcars "from the crude oil group of NGL" and needed them to be cleaned and serviced. *See id.* at 5-6.

During depositions held on September 20 and 21, 2017, Eagle obtained information that non-party Centennial may have transferred its legal rights to NGL. At the conclusion of the latter deposition, NGL produced a June 30, 2016 written assignment of legal claims between it and Centennial that (1) identifies both entities as wholly owned subsidiaries of NGL Energy Partners, LP ("NGL EP"); (2) assigns to NGL "any and all legal and equitable claims [Centennial] has or will have against Eagle"; and (3) is signed by the same individual representing both entities, CFO Robert Karlovich. *See* Doc. 44 at 115-16; Doc. 50 at 20-21.

On September 26, 2017, Eagle moved for leave to file a first amended answer based upon (1) an August 15, 2017 document production regarding NGL's damages; (2) a September 19, 2017

confirmation from NGL counsel that a three-page spreadsheet comprises their damages claim; and (3) the newly discovered information from the depositions of September 20 and 21, 2017. *See* Doc. 34. Early the next month, Eagle moved to modify the pretrial scheduling order, but did not seek to extend any deadline regarding expert witnesses or joining new parties. *See* Doc. 35.

After reviewing the briefing and applicable law, the Court granted the first motion and partially granted the second motion in October 2017. *See* Order (doc. 41). In doing so, the Court found good cause for granting leave to file an out-of-time, amended answer based on significant new evidence that came to light during discovery. It also found the delay excusable and that Plaintiff acted promptly when it learned of the new information. In addition, the Court found good cause to extend the discovery and dispositive motion deadlines, respectively to January 31, 2018, and March 5, 2018. In its First Amended Answer to Defendant's Counterclaim (doc. 42), Eagle adds affirmative defenses nine through sixteen to the original answer: (9) offsets and credit; (10) repudiation of contract; (11) fraud; (12) impossibility of performance; (13) novation; (14) unconscionability; (15) contract modification; and (16) discharge from performance.

Following that order, Eagle agreed to supplement its discovery responses regarding its defenses of offset and credit. *See* Doc. 44 at 21-22. On November 22, 2017, Eagle noticed a deposition of an NGL representative pursuant to Fed. R. Civ. P. 30(b)(6). *See* Doc. 58 at 18-24. It requested a designated representative knowledgeable about fourteen topics, including (3) "Any agreements, contracts, or other understandings between NGL, Centennial," GE Rail, HSCOM, GPTG, First Union, TransMontaigne, and Gavilon and (11) "NGL's efforts to locate and produce documents responsive to Eagle's discovery requests." *Id.* at 23-24.

Five days later, NGL supplemented its prior document production with two additional written

assignments of legal claims dated June 30, 2016. *See* Doc. 50 at 22-24. These assignments are materially the same as the assignment between NGL and Centennial other than respectively changing the assignor to HSCOM and TransMontaigne. *See id.* The next day, NGL served objections and responses to the Rule 30(b)(6) deposition. *See* Doc. 58 at 27-33. NGL objected that topic 3 "is vague, ambiguous, completely unlimited in time and scope, and seeks information that is irrelevant." *Id.* at 29. Subject to those objections, it designated

> Mitch Walker to testify regarding the lease agreements for the 71 railcars at issue in this lawsuit and any agreements, contracts, or understandings beyond the lease agreements between it and the named lessors . . . related to the leases and any agreements, contracts, or understandings between it and its affiliates or successors-in-interest . . . regarding the lease agreements for the 71 railcars at issue.

*Id.* With respect to topic 11, NGL designated "Walker to testify regarding its efforts to locate and produce documents responsive to Eagle's non-objectionable discovery requests in this matter." *Id.* at 32.

Eagle deposed Walker the next day. *See* Doc. 48 at 19. He identified NGL EP as the parent company of NGL, NGL Crude Transportation, LLC ("NGL Transport"), and Centennial and stated that an organizational chart exists for NGL EP that lists all the related entities. *Id.* at 32, 36, 41. He also identified Mitch Wood as a person employed by either NGL or NGL Transport and stated that, in his opinion, the parties to this litigation formed one agreement prior to the arrival of the first railcar at Eagle's facility and this agreement resulted from communications between Eagle and Wood and/or Byron Stewart.[7] *Id.* at 31, 32, 34. He further testified that there are written agreements between NGL and NGL Transport related to which entity is responsible for various things. *Id.* at 34-

---

[7]On December 13, 2017, Wood likewise testified that he was employed by either NGL or NGL Transport. *See* Doc. 48 at 48-52.

36. He stated a belief that either NGL or Centennial paid excess lease charges for railcars at Eagle's facility. *Id.* at 32-33.

Walker also testified about NGL's acquisitions of various contracts and leases. *See id.* at 38-42. He stated that NGL or NGL EP bought and absorbed certain contracts of TransMontaigne. *Id.* at 38-39. He further testified that TransMontaigne and HSCOM were subsidiaries and that NGL had assumed their obligations. *See id.* at 40. The HSCOM acquisition occurred prior to Gavilon and before any railcars were sent to Eagle. *Id.* at 41. Likewise, NGL EP acquired Centennial before NGL sent any cars to Eagle. *See id.* at 41-42.

When he testified about the legal assignment of claims, Walker stated that he did not know the date they were executed but had just recently become aware of the assignment from Centennial. Doc. 58 at 90. He testified that he did not believe the assignments were executed prior to the lawsuit, but would need to "look at the assignment to be certain." *Id.* at 91. He did not know who drafted them. *Id.*

On December 18, 2017, Eagle served supplemental interrogatory answers that identified fact witnesses, including Walraven, Calfee, and Deloera, who have "knowledge of the damages incurred by Eagle" from actions of NGL and its affiliates.[8] *See* Doc. 44 at 38-40. In addition, Eagle identified Matthew Hurt as an individual who "has knowledge of the services rendered by Eagle and the legal and technical requirements to conduct valve inspection." *Id.* at 40. At that time, Eagle had "yet to finalize a total amount of damages." *Id.* at 41.

---

[8]Because Eagle's claims in this action have been resolved, the term "damages" is slightly misleading. Nevertheless, it is clear that the term, as it applies to Eagle, refers to its offset defense, which would work to reduce any damages owed by Eagle to NGL. Like the parties, the Court will use it as a shorthand way of referring to damages that could be offset through the affirmative defense of Eagle.

On December 22, 2017, Eagle served its Second Request for Production of Documents to NGL. *See* Doc. 58 at 34-40. Thirty-eight separate requests for production ("RFP") comprise this Second Request. *See id.* at 36-39.

The next month, Eagle served purported supplemental expert designations under Fed. R. Civ. P. 26(a)(2)(B) for Hunter, including a report dated January 12, 2018, and under Rule 26(a)(2)(C) for Calfee, Walraven, and two newly identified employee experts (Adolf Deloera and Matt Hurt).[9] *See* Doc. 44 at 47-71. Hunter again set out his background and experience, his expert witness case history, the documents he reviewed, and a factual history of this case. *Id.* at 53-62. He then set out his expert opinions regarding damages to Eagle caused by NGL. *See id.* at 62-70.

On January 22, 2018, NGL served its Objections and Responses to Plaintiff's Second Request for Production. *See* Doc. 58 at 41-68. NGL objected to each RFP, except RFP 38, which it stated that no responsive documents exist. *See id.* at 43-68. NGL produced no additional documents in response to the Second Request for Production. *See id.*

Just prior to the close of discovery, NGL filed its objection and motion (doc. 43). The first week of February 2018, Eagle moved for leave to file a third-party complaint (doc. 47). Due to the pendency of these motions, the parties filed an agreed motion to modify the pretrial schedule that the Court granted on February 22, 2018, vacating the dispositive motion deadline and stating that it will reset that deadline and any other necessary pretrial deadline after considering the pending motions. These motions became ripe for ruling with the filing of reply briefs in mid-March 2018.

---

[9]Although the supplemental expert designations identify this expert as "Matt Hurd," *see* Doc. 44 at 48, supplementation to interrogatory answers identify him as Matthew Hurt, *see id.* at 40, and the parties' briefing on the motion refers to him as "Matt Hurt," *see* Doc. 43 at 9; Doc. 49 at 12. Similarly, supplemental interrogatory answers identify Deloera as "Adolph Deloera," Doc. 44 at 39, but the formal designation spells the first name as "Adolf," *see id.* at 48. Based on all the information before it, "Hurt" and "Adolf" appear to be correct.

The same day that Eagle's motion became ripe, March 14, 2018, Eagle filed its motion to compel and for sanctions (doc. 57). That motion became ripe for ruling with the filing of Eagle's reply brief on April 23, 2018.

## II.  MOTION TO EXCLUDE

NGL objects to and seeks to exclude Eagle's January 2018 expert designations on grounds of untimeliness. Alternatively, it asks the Court to order Eagle to pay its reasonable and necessary attorneys' fees and expenses caused by the untimely expert designations. Relying on Fed. R. Civ. P. 37(c)(1), which governs sanctions for failing to provide information or identify a witness as required by Fed. R. Civ. P. 26(a), NGL moves to exclude the disclosures entirely or obtain its fees and expenses. Eagle contends that it timely supplemented its expert disclosures, but if the Court disagrees or finds NGL prejudiced, it argues that the requested exclusion or other sanction is unwarranted because any violation of Rule 26(a) was substantially justified or harmless.

### A.  Expert Disclosure Requirements

As relevant to this case, Fed. R. Civ. P. 26(a)(2)(A) provides generally that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Absent a stipulation between the parties or otherwise ordered by the court, subparagraph (B) requires the disclosure to "be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." For expert witnesses not required to provide a written report, subparagraph (C) requires the disclosure to state "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opin-

10

ions to which the witness is expected to testify." Like subparagraph (B), the requirements of subparagraph (C) are contingent on the absence of a stipulation or order of the court. Not only does Rule 26(a)(2) address who and what must be disclosed with respect to expert witnesses, but subparagraph (D) also sets a generally applicable deadline for disclosure of expert testimony absent a stipulation or court order – at least ninety days before trial unless "the evidence is intended solely to contradict or rebut evidence" of another party, in which case, the rebuttal expert disclosure must be made within thirty days of the other party's disclosure.

The expert disclosure rules also require parties to supplement their "disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). In general, Rule 26(e) requires parties to supplement their Rule 26(a) disclosures

> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

> (B) as ordered by the court.

Furthermore, for Rule 26(a)(2)(B) disclosures, "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Rule 26(a)(3)(B) requires disclosures to "be made at least 30 days before trial" absent a court order setting a different deadline.

## B. Timeliness of Expert Disclosures

In this case, the Court set deadlines for Rule 26(a)(2) disclosures. In May and June 2017, both parties made timely expert disclosures consistent with those deadlines as extended by the Court

on motion of the parties. At that time, Eagle merely made rebuttal disclosures in response to NGL's expert disclosure. No one questions the timeliness or adequacy of these initial expert disclosures.

After the deadlines for expert disclosures passed, Eagle moved for leave to file an amended answer with eight new affirmative defenses to NGL's counterclaims. It also moved to modify the governing pretrial scheduling order, but in so doing, it did not seek any change to the expert disclosure deadlines. The Court granted leave to file the amended answer and extended the discovery and dispositive motions deadlines. It did not reset or extend any expert designation deadline.

Eagle states that, "after the Court granted [it] leave to file its affirmative defenses and extended the discovery period on October 26, 2017, there was no limitation that a party was restricted from discovery of or providing support regarding these new affirmative defenses" and "there were no restrictions regarding expert designations or factual witnesses that limited [its] ability to support these defenses." Doc. 49 at 5. In other words, Eagle contends that this action lacks a court order setting an expert witness deadline regarding its new defenses because the Court allowed the amended answer without imposing a specific deadline for expert disclosures relative to the new defenses.

While the Court understands the basis for that line of reasoning, it does not agree that the default deadlines set out in Rule 26(a)(2)(D) automatically spring back into play following leave to file an amended pleading. Once a court issues an order setting expert designation deadlines, those deadlines apply, even if expired, until the court otherwise orders. Through its Pretrial Scheduling Order, the Court set specific deadlines for all expert designations under Rule 26(a)(2). That those deadlines expired before the Court granted Eagle leave to file an amended answer with new affirmative defenses does not revert the case to the general deadline set out in Rule 26(a)(2)(D), i.e., at least ninety days before trial, which only applies absent stipulation or court order. As stated in Rule

26(a)(2)(D), parties must make their expert "disclosure at the times and in the sequence that the court orders." When a party wants to revive expired deadlines, the proper procedure is to move to extend them. Alternatively, a party may move for leave to take action past an expired deadline. The latter alternative essentially has the same effect as moving to extend the deadline. Eagle pursued neither of these alternatives. Its 2018 expert disclosures are untimely under the court-imposed deadlines set out in the Pretrial Scheduling Order as amended by later orders of the Court.

Eagle, however, specifically argues that, because its 2018 expert disclosures qualify as supplemental disclosures under Rule 26(a)(2)(E), the expired deadlines do not apply. Under this scenario, the deadline for supplemental expert disclosures would be governed by Rule 26(e) rather than the court-imposed deadlines for initial expert disclosures. NGL contests the characterization of the 2018 disclosures as supplemental.

The Fifth Circuit has long recognized that supplementary disclosures are merely intended "to supplement," not "to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996). Supplementary "disclosures are not intended to provide an extension of the expert designation and report production deadline." *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998); *accord Harmon v. Ga. Gulf Lake Charles L.L.C.*, 476 F. App'x 31, 36 (5th Cir. 2012) (per curiam). When a "supplemental report is comprised of new, previously undisclosed opinions," it is not truly a supplement and must be filed within the deadline for expert opinions set by the court. *See Elliot v. Amadas Indus., Inc.*, 796 F. Supp. 2d 796, 802 (S.D. Miss. 2011). Similarly, when a report "contains entirely new opinions or addresses subject matter outside the scope of [the initial] designation and [the] initial report, it is not a supplement.

Rather, it is an untimely designation." *Ishee v. Fed. Nat'l Mortg. Ass'n*, No. 2:13-CV-234-KS-MTP, 2015 WL 224800, at *2 (S.D. Miss. Jan. 15, 2015).

Although Eagle characterizes the 2018 expert disclosures as supplemental, it identifies two entirely new experts and provides a new report from Hunter that expresses opinions regarding damages to Eagle. Furthermore, Eagle's initial expert designations were for rebuttal only. Eagle intends the expert opinions designated in 2018 to support its affirmative defenses. The 2018 disclosures are not supplemental. They are thus untimely unless the Court extends the deadline or otherwise allows Eagle to make the disclosures outside the deadline.

## C. Sanctions for Untimely Disclosures

Pursuant to Fed. R. Civ. P. 37(c)(1), NGL argues that the failure of Eagle to make timely disclosure of its experts warrants excluding the expert opinions disclosed in 2018. That rule provides in pertinent part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> > (A) may order payment of the reasonable expenses, including attorney's fees caused by the failure . . ..

Because the only issue is one of timeliness of its disclosures, Eagle focuses on the word, "if," to argue that it has not failed to provide information or designate a witness. *See* Doc. 49 at 9. That argument, however, overlooks precedent that an untimely disclosure is considered a failure to disclose. *See Drechsel v. Liberty Mut. Ins. Co.*, No. 3:14-CV-162-M-BN, 2015 WL 7067793, at *2 (N.D. Tex. Nov. 12, 2015) (treating an untimely disclosure the same as a complete failure to disclose). As found

and explained in the preceding paragraphs, Eagle's 2018 expert disclosures are untimely and do not constitute supplemental disclosures to which the court-imposed deadlines would not apply.

In any event, Fed. R. Civ. P. 37(c)(1) provides a means to avoid sanctions. The rule "does not require witness preclusion for untimely disclosure if missing the deadline is harmless" or substantially justified. *Klein v. Fed. Ins. Co.*, No. 7:03-CV-102-D, 2015 WL 1525109, at *3 (N.D. Tex. Apr. 6, 2015) (quoting *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 196 (4th Cir. 2003)). As the "disclosing (or late disclosing) party," Eagle "bears the burden of proving the failure to timely disclose was substantially justified or harmless." *Drechsel*, 2015 WL 7067793, at *2. The courts, however, have "broad discretion in deciding whether a Rule 26(a) violation is substantially justified or harmless." *Klein*, 2015 WL 1525109, at *3 (quoting *Sea Side Villas II Horizontal Prop. Regime v. Single Source Roofing Corp.*, 64 F. App'x 367, 372 (4th Cir. 2003)).

"Substantial justification for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure [obligation]." *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 205 (5th Cir. 2016) (quoting *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 140 n.23 (3d Cir. 2009)).[10] To be substantially justified, a "decision to refrain from disclosing the information must have had a 'reasonable basis in both law and fact." *Id.* (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

To determine whether a disclosure violation is harmless, courts examine four factors: "(1)

---

[10]Although *Olivarez* primarily addressed "substantial justification" in the context of Fed. R. Civ. P. 26(g)(3), it also mentioned that avenue for avoiding sanctions under Rule 37(c)(1). *See* 844 F.3d at 203-06. Furthermore, *Grider*, the case relied upon in *Olivarez*, addressed the substantial justification standard under both Rules 26(g)(3) and 37(c)(1). *See* 580 F.3d at 140-41. There is no reason to apply different standards for the same terminology used in the two rules.

the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003). Courts use the same factors to guide their discretion when deciding whether to grant or deny a party leave to designate an expert witness out of time. *See Bradley v. United States*, 866 F.2d 120, 124-25 (5th Cir. 1989). Additionally, the Fifth Circuit applies similar factors when determining whether a court abuses its discretion when refusing to modify a scheduling order. *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA,* 315 F.3d 533, 535 (5th Cir. 2003) (considering (1) the explanation for the need for the requested modification; (2) the importance of obtaining the modification; (3) potential prejudice in allowing the modification; and (4) whether the court may cure such prejudice through an appropriate continuance). Accordingly, trial courts consider these factors when deciding whether good cause exists to modify a scheduling order. *See Info-Power Int'l, Inc. v. Coldwater Tech., Inc.*, No. 3:07-CV-0937-P, 2008 WL 5552245, at *3 (N.D. Tex. Dec. 31, 2008). Courts consider these factors "holistically"and do not simply count the factors on each side of the scale. *See Klein*, 2015 WL 1525109, at *3 (quoting *Hoffman v. L & M Arts*, No. 3:10-CV-0953-D, 2013 WL 81578, at *3 (N.D. Tex. Jan.8, 2013)); *Choice Hotels Int'l, Inc. v. Goldmark Hosp., LLC*, No. 3:12-CV-0548-D, 2014 WL 80722, at *2 (N.D. Tex. Jan. 9, 2014).

Although Eagle mentions substantial justification, it does so only in the context of the four factors that courts consider to determine harmlessness. *See* Doc. 49 at 11. While substantial justification may be somewhat similar to the explanation component of the four factors, it is a separate and independent basis to avoid sanctions for a complete or untimely failure to disclose. If a party shows substantial justification, the four-factor test is irrelevant. In a sense, substantial justification equates

to an explanation that overrides the other three factors.

While Eagle does not specifically argue that its failure to timely disclose was substantially justified, it presents several justifications for not making an earlier disclosure. As already discussed, viewing the disclosures as supplemental is not justified in law or fact on the facts before the Court. Similarly, although a closer call on the facts of this case, the Court does not find Eagle substantially justified in relying on the default deadlines of Fed. R. Civ. P. 26(a)(2)(D) given the court-imposed expert deadlines that had already expired in this case. Likewise, even though Eagle had no affirmative defense requiring expert support until the Court granted it leave to file its amended answer and that fact may qualify as substantial justification for not making the expert designations by June 30, 2017, the circumstances as a whole do not qualify as substantial justification for not making the designations until January 2018.

Absent substantial justification for the untimely disclosure, Eagle must show that its 2018 expert disclosure is harmless under the four factor test. Because the courts consider the same or similar factors, the harmlessness issue is materially the same as considering whether the Court should extend the deadline for expert disclosures or otherwise permit Eagle to make its most recent disclosures out of time. The parties have divergent views on whether the various factors weigh in favor of or against striking the 2018 expert disclosures. This is perhaps most notably reflected in their positions on the explanation factor. NGL contends that Eagle has offered no explanation for making its entirely new expert opinions within a month of the close of discovery in a case it filed more than nineteen months before. Doc. 43 at 13. NGL states that Eagle has no excuse for "sandbagging" it with new expert opinions. *See id.* Eagle counters this position by pointing to delays caused by NGL's failures to timely disclose the assignment of claims. Doc. 49 at 11-12. It also reiterates that

it had no affirmative defenses needing expert support until the Court granted leave for it to file its amended answer in October 2017 and, in its view, it complied with the Federal Rules of Civil Procedure. *Id.* at 11. Additionally, it explains that its retained expert needed time to view Eagle's Roscoe facility, interview witnesses, and formulate his opinion on damages. *Id.* at 11-12.

Contrary to NGL's position, Eagle has provided an excuse for its failure to timely make its expert designations. Furthermore, the nineteen months mentioned by NGL vastly overstates the delay. Nevertheless, when Eagle moved to modify the scheduling order in October 2017, it should have anticipated a need for expert opinions to support its new affirmative defenses. At that time, it knew of one reassignment of claims to NGL. Even if Eagle saw no need to extend the expert deadlines until the Court granted it leave to file the amended answer, Eagle could have moved for an extension of that deadline shortly after the Court granted leave. That Eagle later learned of two other reassignments may have affected the scope of the expert opinions but not the need for such opinions to support its affirmative defenses. In any event, NGL's delayed disclosure of the written assignment of claims played a role in the Court finding good cause to extend various deadlines and to permit Eagle to file its amended answer. To that extent, it provides an explanation for why Eagle did not make its expert disclosures before the court-imposed deadline expired in June 2017.[11]

Furthermore, even though the Court does not agree that Eagle's 2018 expert disclosures are timely under the Federal Rules of Civil Procedure, Eagle's argument that the default deadlines set out in the federal rules apply, rather than the expired court-imposed deadline, provides an additional basis for the timing of the expert disclosures. The Court's disagreement with the argument does not

---

[11]The Court recognizes that NGL maintains that its claims have not changed in this action. *See* Doc. 55 at 4-6. But it concedes that the assignments and leases support its measure of damages. *See id.* at 5. Thus, although the assignments and leases do not necessarily expand NGL's claims, they do expand the liability exposure of Eagle to NGL.

make the argument immaterial to this factor. Further, although the Court has found that the argument does not constitute substantial justification for the untimely disclosure, the explanation factor does not require that the proffered reason rise to the level of substantial justification. Coupled with the matters addressed in the preceding paragraph, the argument enhances the reasons proffered for the untimely disclosure. On the other hand, the Court accords no weight to Eagle's explanation that it was merely supplementing its prior disclosure. In light of the well-established case law on such supplementation, that proffered reason does not bolster Eagle's explanation for the untimely disclosure.

Eagle made its January 2018 expert disclosures before the end of discovery and less than three months after the Court permitted the filing of the amended answer with new defenses. Had Eagle sought an extension of the expert disclosure deadlines in October 2017 or soon after the Court granted it leave to file its amended answer, the Court would have considered a three-month extension reasonable and warranted. The timing of the disclosures may affect the prejudice to NGL but does not significantly detract from the reasons for the untimeliness.

Turning to the importance of the 2018 expert opinions, they appear important to the affirmative defenses against counterclaims asserted Eagle. In general, expert testimony regarding damages is important. *See Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007). That the testimony here would relate to damages in the form of offsetting damages owed to NGL does not make the testimony any less important. NGL argues that, if the expert opinions were important, Eagle should have included them with its initial expert disclosures or when it moved to add its affirmative defenses. Doc. 43 at 12. The Court disagrees with the first part of this argument. Eagle had no need for expert opinions regarding its affirmative defenses, including any expert opinion regarding the

19

amount of damages that are subject to the offset defense, until the Court granted it leave to file its amended answer. Similarly, while Eagle certainly could have moved to revive and extend the expired expert witness deadlines when it moved to extend other deadlines, the failure to do so does not of itself make the later expert opinions unimportant.

NGL also argues that the expert opinions are unimportant "because they bear no relationship" to its counterclaims asserted against Eagle. *Id.* This conclusory statement is insufficient to find the opinions unimportant. The statement, moreover, seems completely at odds with its position that its "potential prejudice" from allowing the opinions at this juncture would be "immense." *Id.* It argues that the untimely designations have prejudiced it strategically in that it has lost the potential advantages of designating rebuttal experts, deposing other witnesses, preparing its own witnesses about the previously undisclosed damages model. *Id.* at 2-3, 13. It also argues that allowing the disclosures will force it to incur additional cost and expense to (1) "start from scratch on discovery of Eagle's business operations to properly evaluate the 'damages' model," (2) retain and designate a rebuttal expert, and (3) depose or re-depose witnesses, including Calfee, Deloera, Walraven, and Hunter. *Id.* at 3, 14. It asserts that another continuance cannot cure its prejudice because (1) the case has been pending for more than nineteen months and (2) discovery is complete except for a fact witness and expert for each side (at the time of the motion's filing). *Id.* at 14.

Eagle characterizes any prejudice to NGL as minimal. Doc. 49 at 12. It submits that (1) NGL has known about all designated expert witnesses except Hurt since nearly the start of this case; (2) only two depositions occurred before the Court granted leave to file the amended answer (Deloera and Calfee); (3) Hurt can be made available for a deposition; (4) Walraven's deposition took place after the 2018 expert designation; and (5) NGL chose not to depose Hunter despite opin-

ions stated in his original report. *See id.* at 6, 12-13. Eagle contends that the Court can cure any alleged prejudice by allowing time for NGL to depose these individuals and to submit rebuttal experts. *Id.* at 13-15.

Under the facts of this case, the Court finds some prejudice to NGL from the untimely designation of experts. However, NGL overstates its prejudice and fails to recognize its role in the delays in this case. Furthermore, the Court agrees that it can cure any prejudice to NGL with an appropriate continuance and other appropriate orders of the Court. The Fifth Circuit has "repeatedly emphasized that a continuance is the preferred means of dealing with a party's attempt to designate a witness out of time." *Betzel*, 480 F.3d at 708. A brief extension of time can provide NGL an opportunity to depose the designated expert witnesses and to designate experts for rebuttal. The Court previously vacated the dispositive motion deadline, including any *Daubert* challenge. Additionally, Eagle has stated that it will produce Deloera and Calfee for second depositions and does not object to allocating time for NGL to designate rebuttal experts. Doc. 49 at 15.

Weighing the relevant factors, the Court finds that on balance they do not support excluding Eagle's 2018 expert designations or otherwise sanctioning Eagle for the untimely designations. Eagle has provided a persuasive explanation for why it did not comply with the expert designation deadline. Although it could have acted more expeditiously by seeking to extend that deadline in October 2017 or when it moved for leave to file its amended answer to NGL's counterclaims, the prejudice to NGL from that delay is minimal and the Court can cure that prejudice by extending the discovery deadline and permitting NGL to designate rebuttal expert witnesses. Accordingly, the Court denies the motion to exclude and will issue appropriate orders to cure the prejudice to NGL. Even though the Court denies the motion, it finds no basis to sanction NGL for filing it.

### III.  MOTION FOR LEAVE TO FILE THIRD PARTY COMPLAINT

Pursuant to Fed. R. Civ. P. 14, Eagle moves for leave to file a third party complaint against Centennial, HSCOM, TransMontaigne, Gavilon, NGL Transport; and NGL EP based on information uncovered during discovery.  *See* Doc. 47 at 2; Doc. 48 at 1-10.  In the proposed third-party complaint, Eagle asserts seven counts against these entities:  (1) apparent authority, (2) actual authority, (3) respondeat superior, (4) ratification, (5) piercing the corporate veil, (6) joint enterprise, and (7) third-party beneficiary breach of contract.  *See* Doc. 48 at 1-10.

Rule 14 addresses third-party practice in federal courts.  Because Plaintiff/Counter-Defendant Eagle seeks to add the third parties, the Court first looks to Rule 14(b), which provides that "[w]hen a claim is asserted against a plaintiff, the plaintiff may bring in a third party if this rule would allow a defendant to do so."  Thus, applying that rule, the Court next looks to Rule 14(a), which addresses when a defending party may bring in a third party.  It provides:

> A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it.  But the third-party plaintiff must, by motion, obtain the court's leave if it files the third-party complaint more than 14 days after serving its original answer.

Because Eagle seeks to add a third party more than fourteen days after serving its original answer, it seeks leave of court in accordance with Rule 14(a).

Courts liberally interpret Rule 14 and it lies within their wide discretion as to whether to grant leave to resort to the third-party procedure.  *Hancock v. Chicago Title Ins. Co.*, 263 F.R.D. 383, 392 (N.D. Tex. 2009), *aff'd sub nom. Benavides v. Chicago Title Ins. Co.*, No. 10-10136, 2011 WL 1057567 (5th Cir. Mar. 23, 2011).  The courts may consider several factors in deciding a Rule 14 motion, including "prejudice to the parties, complication of trial issues, likelihood of delay, and

timeliness." *Id.* They may also consider "whether allowing the third-party complaint would further the goals of judicial economy and eliminating duplicative suits." *TIB-The Indep. BankersBank v. Hometown Bank, N.A.*, No. 3:13-CV-2825-M, 2013 WL 6159310, at *2 (N.D. Tex. Nov. 25, 2013). No factor is "necessarily dispositive, and there is little case law in the Fifth Circuit that examines what factors are properly considered when deciding whether to permit a third-party complaint." *Id.*

While there may be some uncertainty as to what factors are properly considered, it is clear that a party may assert a third-party claim "under Rule 14(a)(1) only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to the defending party." *Id.* In other words, the third-party process requires that the movant is attempting to transfer its liability on the claims against it to a third party . *See id.* "The secondary or derivative liability notion is central and thus impleader has been successfully utilized when the basis of the third-party claim is indemnity, subrogation, contribution, express or implied warranty, or some other theory." *Martco Ltd. P'ship v. Bruks Inc.*, 430 F. App'x 332, 334-35 (5th Cir. 2011) (per curiam) (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1446, at 415-21 (3d ed. 2010)).

Here, NGL sues Eagle for breach of contract, promissory estoppel, and negligent misrepresentation stemming from an alleged oral agreement for Eagle to clean railcars at its Roscoe, Texas facility. If NGL succeeds on one or more of its claims, Eagle's offset defense may reduce the amount of damages owed. But Eagle now wants to name six entities as third-party defendants based upon seven causes of action. One of these entities (Gavilon) is merely defendant/counter-plaintiff NGL, except under its previous name. Thus, Gavilon does not appear to be a proper third-party defendant. Furthermore, it does not appear that the liability of any other third-party defendant is

dependent on the outcome of NGL's claims or that any third-party defendant is secondarily liable to Eagle.

At no point in the proposed third-party complaint does Eagle mention indemnity, subrogation, contribution, or express or implied warranty. It instead relies on "some other theory," namely apparent or actual authority, respondeat superior, ratification, piercing the corporate veil, joint enterprise, and third-party beneficiary breach of contract. While some of these may be forms of derivative liability arising from an underlying substantive cause of action, none of them are separate, viable causes of action themselves. *See Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 138 n.7 (5th Cir. 1990) (recognizing that respondeat superior " is not, in and of itself, a cause of action"); *Huggins v. Royalty Clearinghouse, Ltd.*, 121 F. Supp. 3d 646, 658 (W.D. Tex. 2015) (recognizing that ratification "is an equitable defense and may not be used to create a cause of action"); *Fredericksen v. Halliburton Co.*, No. CIV.A. H-10-1892, 2011 WL 1232991, at *5 (S.D. Tex. Mar. 31, 2011) (noting and citing cases for proposition that claims of agency, joint enterprise, and direct corporate liability are not legal causes of action); *Focus Direct, Inc. v. Sekulow*, No. SA-02-CA-1175-RF, 2003 WL 22143281, at *1 (W.D. Tex. Sept. 5, 2003) (recognizing that status as a third-party beneficiary does not make that beneficiary subject to suit for breach of a contract to which the beneficiary was not a party). Moreover, none of these purported causes of action are dependent on the outcome of NGL's claims against Eagle or make any third party secondarily liable to Eagle.

Eagle submits that the "crux of [its] legal theories in its third-party complaint against the third-party defendants is that Eagle suffered damages by entering into agreements with [NGL and Wood] as agents for these principals." Doc. 47 at 4-5. Further, as stated in the proposed third-party complaint, Eagle seeks "damages including switching charges, storage charges, and lost profits"

resulting directly from work performed on the seventy-one cars at issue in this litigation. *See* Doc. 48 at 5. These are the same "damages" that would be allegedly offset by Eagle's affirmative defense. When damages are offset there is no basis transfer the liability to a third-party.

Eagle does not show how its third-party claims transfer liability on NGL's claims to any third party. It instead appears that Eagle seeks to impose direct liability on the six entities based on the purported third-party claims sought to be asserted. This is not the purpose of third-party practice under Rule 14. Accordingly, the Court may deny the motion for this reason alone.

Furthermore, the deadline for adding new parties expired in March 2017 and adding six parties at this juncture will substantially delay this action and unduly complicate trial issues. This case is already in an unusual procedural posture given the settlement of Eagle's claims against NGL, thus, leaving only the counterclaims against Eagle and its affirmative defenses. The likely substantial delay that would result from the addition of the new parties would undoubtedly prejudice NGL. Weighing these factors favors denying the motion for leave. In addition, the goals of judicial economy and eliminating duplicative suits do not tilt the scales in favor of granting the motion in this case. As noted previously, the seven causes of action sought to be asserted against the third-parties are not separate, viable causes of action.

Eagle explains that the untimely disclosure of the assignment of claims to NGL created the need for the third-party complaint. While the assignment disclosure played a role in the Court's decision to permit Eagle to file an amended answer to assert new affirmative defenses against NGL and the Court's decision to deny NGL's motion to exclude, the factors do not justify adding new parties to this action at this juncture of the litigation. If Eagle desires to bring suit against the entities named in the third-party complaint, it should pursue its claims in a separate civil action.

Eagle also states that, although NGL has taken the position that one agreement forms the basis for its counterclaims against Eagle, deposition testimony of NGL's designated corporate representative and its rail transportation manager shows that NGL Transport rather than the counter-plaintiff in this case (NGL) is the relevant party to that agreement. Whether NGL is a proper party to the alleged agreement goes to whether NGL can recover damages on its claims and could reduce or eliminate damages Eagle would owe NGL. Proper party status does not affect whether Eagle will have damages that it needs to transfer to any third-party.

For all of these reasons, the Court denies Eagle leave to file its third-party complaint. Under the facts before it, the Court exercises its discretion to deny leave for Eagle to resort to the third-party procedure.

## IV. MOTION TO COMPEL AND FOR SANCTIONS

Pursuant to Fed. R. Civ. P. 37(a), Eagle moves to compel NGL to properly respond to its Second Request for Production and to produce an appropriate corporate representative for deposition under Fed. R. Civ. P. 30(b)(6). Doc. 57 at 8-13. Alternatively, Eagle requests that the Court strike NGL's affirmative claims due to its untimely and unsubstantiated disclosure of the legal assignments relevant to this case. *Id.* at 13-15. NGL asserts that (1) Eagle has failed to meet threshold requirements before filing its motion to compel; (2) it has complied with its discovery obligations; and (3) the requests are patently overbroad. Doc. 61 at 2-6.

### A. Threshold Requirements

There are at least three "threshold requirements for a proper Rule 37(a) motion to compel." *Samsung Elecs. Am. Inc. v. Chung*, No. 3:15-CV-4108-D, 2017 WL 896897, at *13 (N.D. Tex. Mar. 7, 2017). The movant must (1) "meet and confer regarding the specific discovery disputes at issue";

(2) attach a copy of the discovery requests, responses, and objections that are placed at issue by the motion; and (3) "specifically and individually identify each discovery request in dispute and specifically, as to each request, identify the nature and basis of the dispute." *Id.* Eagle has complied with the second requirement. *See* Doc. 58 at 18-24 (Pl.'s Rule 30(b)(6) Notice of Deposition); 27-33 (Def.'s Objections & Resps. Pl.'s 30(b)(6) Notice); 41-68 (Def.'s Objections & Resps. Pl.'s Second Request for Production); 69-96 (excerpts of transcript of deposition of corporate representative). NGL claims that Eagle has complied with neither the first nor the third requirements.

### 1. Conference Requirements

Parties that move to compel disclosure or discovery must "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). The local rules of this Court, furthermore, require parties to confer before filing non-dispositive motions unless "a conference is not possible." N.D. Tex. L. Civ. R. 7.1(a). In addition, "[e]ach motion for which a conference is required must include a certificate of conference indicating that the motion is unopposed or opposed," and if the "motion is opposed, the certificate must state that a conference was held, indicate the date of conference and the identities of the attorneys conferring, and explain why agreement could not be reached." *See* N.D. Tex. L. Civ. R. 7.1(b)(1) and (2). When "a conference was not held, the certificate must explain why it was not possible to confer, in which event the motion will be presumed to be opposed." *See* N.D. Tex. L. Civ. R. 7.1(b)(3).

"Conference requirements 'encourage resolving discovery disputes without judicial involvement.'" *Brown v. Bridges*, No. 12-CV-4947-P, 2015 WL 11121361, at *4 (N.D. Tex. Jan. 30, 2015) (quoting *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 456, 459 (D. Kan.

1999)), *modified in part on other grounds*, 2015 WL 12532137 (N.D. Tex. June 22, 2015). Such requirements are "part and parcel of the ethical rules governing attorneys and the court rules governing all parties, including pro se parties, that require all parties to engage in meaningful discussions in an attempt to resolve matters without court intervention." *Brown v. Bridges*, No. 3:12-CV-4947-P, 2014 WL 2777373, at *2 (N.D. Tex. June 19, 2014) (citing *Dondi Props. Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284, 289-90 (N.D. Tex. 1988)); *accord Carter v. H2R Rest. Holdings, LLC*, No. 3:16-CV-1554-N-BN, 2017 WL 3724122, at *3 (N.D. Tex. Aug. 29, 2017). Failures to confer may lead to unnecessary motions that require judicial resources to resolve disputes that the parties could have worked out themselves. *See Brown*, 2015 WL 11121361, at *4; *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 302 (D. Kan. 1996). In general, the courts find a failure to confer to be an adequate reason to deny a discovery motion. *See*, *e.g.*, *Seastrunk v. Entegris, Inc.*, No. 3:16-CV-2795-L, 2017 WL 6406627, at *10 (N.D. Tex. Dec. 15, 2017); *Harper v. City of Dallas, Tex.*, No. 3:14-CV-2647-M, 2017 WL 3674830, at *13 (N.D. Tex. Aug. 25, 2017); *Brown*, 2015 WL 11121361, at *4.

The facts and circumstances of a given case affect the reasonableness of efforts to confer and the courts examine "all relevant factors to determine whether efforts are reasonable under the circumstances then existing." *Brown*, 2015 WL 11121361, at *4 (quoting *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 193 F.R.D. 696, 699 (D. Kan. 2000)).

> When the dispute involves objections to requested discovery, parties do not satisfy the conference requirements simply by requesting or demanding compliance with the requests for discovery. The parties need to address and discuss the propriety of asserted objections. They must deliberate, confer, converse, compare views, or consult with a view to resolve the dispute without judicial intervention. They must make genuine efforts to resolve the dispute by determining precisely what the requesting party is actually seeking; what responsive documents or information the dis-

covering party is reasonably capable of producing; and what specific, genuine object-
ions or other issues, if any, cannot be resolved without judicial intervention.

*Cotracom Commodity Trading Co.*, 189 F.R.D. at 459.  Further, when a movant raises a number of

issues in a motion to compel, good faith efforts to confer generally require discussion of each matter

in an attempt to resolve each issue without judicial intervention.  *Harper*, 2017 WL 3674830, at *7;

*Brown*, 2015 WL 11121361, at *4.

The courts judge "the reasonableness of movant's good-faith efforts by considering not only

the sheer quantity of contacts, but also their quality in relation to the issues in dispute."  *Carroll v.*

*Allstate Fire & Cas. Ins. Co.*, No. 12-CV-0007-WJM-KLM, 2013 WL 5303483, at *2 (D. Colo.

Sept. 20, 2013).  "The duty to confer involves more than making a certain number of contacts with

opposing counsel.  The quality of the contacts is far more important than the quantity."  *Cotracom*

*Commodity Trading Co.*, 189 F.R.D. at 459.

Counsel for Eagle certified that he and counsel for NGL conferred on February 13 and March

13, 2018, as set out in the motion to compel.  *See* Cert. of Conference (attached to motion).  On Feb-

ruary 13, 2018, counsel conferred during a telephone call that lasted about two hours.  Doc. 57 at 4.

Thirty days later and after receiving no additional documents or any revision or withdrawal of ob-

jections, counseled informed NGL that it was moving forward with the motion to compel.  *Id.*

NGL agrees that the parties engaged in a phone conference on February 13, 2018, and that

Eagle contacted it again on March 13, 2018, but it contests the substance of those communications.

*See* Doc. 61 at 2-3, 6-8.  It disagrees that Eagle conferred in good faith before filing the motion to

compel and submits an email chain that sheds light on the conferences.  *Id.*; Doc. 62 at 21-25.  As

pertinent to the conference issue, the email chain shows the following communications:

(1) Scheduled telephone call for February 13, 2018.

(2) Email from Eagle dated March 13, 2018, at 11:56 AM, which informed NGL counsel (a) left a voicemail to discuss NGL's responses to Second Request for Production; (b) informed NGL that Eagle was "going to move forward with a motion to compel and request for sanctions" as well as moving to compel a proper corporate representative; and (c) informed NGL that counsel was available that day to discuss these matters.

(3) Email from NGL dated March 13, 2018, at 1:48 PM, which states:

> As you know, I agreed to look into a few items like invoices and the like and now have answers to those questions we should discuss. I also asked you whether a potential stipulation that NGL Crude was responsible for Mitch Wood's actions regarding the railcars at issue (or something similar) would resolve Eagle's need for some or any of the documents sought in the 2d requests for production, and have not heard back from you. We are prepared to further confer, and believe that is appropriate as we may be able to reach some agreement or at least narrow the scope of the dispute presented to the court. We obviously disagree that Mitch Walker was unqualified or unprepared, that the associated entities have any relevance to this case, and that the assignments were untimely produced, but are still willing to potentially provide some information if we better understand what documents, information, or stipulations we could provide that address Eagle's actual concerns. . . .
>
> In light of our willingness to continue to try to resolve this matter by agreement, I ask that you not proceed with your motion until we have had the chance to confer as set forth above. However, in the unlikely event you decide to file the motion without conferring with us, please place the entirety of this e-mail in your certificate of conference.

(4) Email from Eagle dated March 13, 2018, at 2:08 PM, which states:

> To be clear, we have conferred. I asked you during our call to review your objections, withdraw and/or revise the same, and indicate whether you actually had documents you were withholding and/or produce any responsive items. [It has] been thirty days and nothing has changed. I'm happy to confer further but we spent two hours on the phone and didn't accomplish anything. Further, as I mentioned during our call, whether or not we can agree on some sort of stipulation does not remove the obligation to properly respond to our discov-

ery requests. I'm here all week and am available throughout next week to discuss any of these issues. We will move forward with our motion.

(5) Email from NGL dated March 13, 2018, at 2:23 PM, which states:

. . . I disagree with your characterization of the call and, particularly how things were left at the end. My understanding was that I would look into several questions, which I have (and you would consider our proposal about a stipulation) and then we would confer again to see if we could reach any agreement to narrow the dispute presented to the court. The first I heard back from you on any of this, thirty days later, was a call during lunch hour followed by a threat of a motion to compel. Since you're apparently refusing to further confer before proceeding with a potentially unnecessary motion, I ask again when you do so that you copy the entirety of this email chain in the certificate of conference.

Doc. 62 at 21-23. Eagle filed its motion to compel the next afternoon. *See* Doc. 57.

The emails of March 13, 2018, add nothing of significance to Eagle's efforts to confer. But they do shed light on whether Eagle conferred in good faith to resolve the issues surrounding its Second Request for Production. The parties have provided relatively sparse information regarding the content of the two-hour phone call of February 13, 2018. But they seem to agree that NGL made various offers to avoid a motion to compel, including a possible stipulation, production and supplementation of responses, and removal of some boilerplate and unsubstantiated objections. Nevertheless, the Court is skeptical that the parties were able to adequately address all the issues raised by thirty-eight requests for production, the objections thereto, as well as the issues regarding NGL's corporate representative. Counsel for Eagle states that during the February telephone call, he asked NGL to review its objections, withdraw and/or revise them, and indicate whether NGL has any responsive documents. That amounts to little more than simply requesting or demanding compliance with the discovery request – actions that do not constitute good faith efforts to confer. While the

parties have conferred about the discovery dispute, Eagle views the February conference as not accomplishing anything. Despite that view, the two-hour conference made some progress in that NGL agreed to look into some items and proposed a stipulation to potentially resolve some issues.

When thirty days passed without further discussion by either party, Eagle essentially said it was going to file the motion to compel. At that point, NGL unambiguously stated its amenability to further conference on the discovery dispute so as to avoid an unnecessary motion. Under these circumstances, good faith would generally require further discussions and conference. This is not to say that a party can continually delay a motion to compel by expressing a willingness to further confer, but Eagle has presented nothing to the Court to show that the parties were indeed at an impasse requiring judicial involvement in the discovery dispute. Nor has it shown that, in the two-hour phone call, the parties were able to discuss and address all the issues presented in the motion to compel.

Under the circumstances of this case, the Court does not find that counsel for Eagle made good faith efforts to resolve the present discovery dispute without judicial intervention. The Court could decline to entertain and thus deny the motion. Courts, however, retain discretion to "waive strict compliance with the conference requirements" and consider a motion on its merits despite the movant's failure to make good faith efforts to confer. *Brown*, 2015 WL 11121361, at *5 (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.*, 168 F.R.D. 295, 302 (D. Kan. 1996)). Circumstances that may justify excusing a failure to satisfy conference requirements include situations when a conference would be no more than "a waste of time," *Vinewood Capital, L.L.C. v. Al Islami*, No. 4:06-CV-316-Y, 2006 WL 3151535, at *2 (N.D. Tex. Nov. 2, 2006), and when "it is clear that the motion is opposed and that a conference would neither have eliminated nor narrowed the parties' dispute,"

*Obregon v. Melton*, No. 3:02-CV-1009-D, 2002 WL 1792086, at *1 n.3 (N.D. Tex. Aug. 2, 2002).

Neither of these circumstances are present here. The email chain shows that NGL remained willing to discuss the matters raised in the motion to compel in an effort to resolve the parties' dispute or to limit the issues needing judicial resolution. This is precisely the purpose of the conference requirements. *See Brown*, 2015 WL 11121361, at *5 ("The conference requirements of the Federal Rules of Civil Procedure and the local rules of this Court serve the important function of narrowing or eliminating issues before a party seeks judicial involvement.").

On the facts of this discovery dispute, the Court finds no reason to waive compliance with the conference requirements. Further conferring on the matters raised in the motion could very well eliminate the need for the motion or, at the very least, limit the issues to be resolved by the Court. In general, "discovery is intended to be an effort of cooperation between parties." *Brown v. Bridges*, No. 12-CV-4947-P, 2015 WL 410062, at *6 (N.D. Tex. Jan. 30, 2015). That cooperative effort is clearly lacking from both sides on this discovery dispute. The Court thus denies the motion to compel and for sanctions for Eagle's failure to adequately confer in good faith prior to filing the motion. This denial is without prejudice to Eagle filing a similar motion should good faith efforts to confer fail to resolve the discovery dispute completely.

Although the Court denies the motion outright, the Federal Rules of Civil Procedure provide a means for the Court to exercise substantial control over the discovery process. The Court finds that a court ruling on some presented issues may appropriately guide the parties as they continue to work to resolve the present discovery dispute and as they pursue remaining discovery during the court's brief extension of the discovery period. Naturally, the Court makes no effort to consider every issue presented by the motion to compel. Many issues can and should be resolved during the natural

course of continued conferring on the discovery issues. Other issues provide reason for brief discussion here. One such issue is the threshold requirement that the movant provide sufficient identifying information relative to the discovery dispute.

### 2. Identifying Requirements

Based upon federal (Fed. R. Civ. P. 7(b)(1) and 37(a)) and local rules (N.D. Tex. L. Civ. R. 5.2(3) and 7.1), a movant must provide necessary identifying information to resolve the dispute presented for judicial resolution. *See Samsung Elecs. Am. Inc. v. Chung*, No. 3:15-CV-4108-D, 2017 WL 896897, at *13 (N.D. Tex. Mar. 7, 2017). More specifically, the movant

> must specifically and individually identify each discovery request in dispute and specifically, as to each request, identify the nature and basis of the dispute, including, for example, explaining . . . how a response or answer is deficient or incomplete, and ask the Court for specific relief as to each request; and must include a concise discussion of the facts and authority that support the motion as to each discovery request in dispute.

*Id.*; *accord Harrison v. Wells Fargo Bank, N.A.*, No. 3:13-CV-4682-D, 2016 WL 1392332, at *7 (N.D. Tex. Apr. 8, 2016).

Eagle has identified the discovery requests in dispute – "every single request, except for production number 38," within its Second Request for Production. *See* Doc. 57 at 8. By arguing that "NGL has provided unsubstantiated boilerplate objections" to each request at issue, Eagle has also identified the nature and basis of the dispute to some extent. *See id.* However, its motion does lack some specificity as to each particular request. Relying on examples of improper objections does not comply with the specificity requirements set out above.

In its reply brief, Eagle argues that NGL should not benefit from its sanctionable conduct, i.e., asserting meaningless, boilerplate objections, by requiring Eagle to guess the basis for NGL's

objections in light of its recitation of the same or similar boilerplate objections to each RFP. *See* Doc. at 4-5. But adequate conferring on these matters in good faith prior to filing the motion to compel could have removed some of the guesswork and provided a basis for Eagle to address a more limited array of objections. Whether or not good faith conferring limits asserted objections or the scope of a motion to compel, the party moving to compel has the initial burden to identify the nature and basis of the discovery dispute with sufficient specificity to (1) explain how each discovery response is deficient or incomplete, (2) ask for specific relief sought for each discovery request, and (3) provide facts and authority to support the motion for each request.

Because Eagle did not engage in good faith efforts to confer on the motion, the Court has no further need to address the lack of specificity in the motion.

## B. Other Matters

Other matters raised through the denied motion to compel also warrant brief discussion so as to clarify erroneous positions.

### 1. Unsubstantiated Boilerplate Objections

The Court has reviewed NGL's responses and objections to the Second Request for Production and agrees that many asserted objections are unsubstantiated boilerplate. Although the Court has denied the motion to compel for failure to confer, it disagrees with NGL's position that it has complied with its discovery obligations. The Court encourages the parties to review and understand *Heller v. City of Dallas*, 303 F.R.D. 466, 485-86 (N.D. Tex. 2014), which provides an accurate "statement of how to properly respond to discovery requests," and *Samsung Electronics America Inc.*, 2017 WL 896897, at *9 (relying on *Heller* and addressing general, boilerplate objections).

35

## 2. Relevancy

NGL contends that the assignments that it has produced in this case have no relevancy to any asserted claim or defense. However, the general scope of discovery under Fed. R. Civ. P. 26(b)(1) is quite broad. Since its amendment in 2015, the rule provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

The advisory committee notes to the 2015 amendments to Rule 26(b)(1) recognize that "[d]iscovery that is relevant to the parties' claims or defenses may also support amendment of the pleadings to add a new claim or defense that affects the scope of discovery." Consequently, for purposes of discovery, relevancy is not constrained to only asserted claims and defenses.

For discovery purposes, the Court has no qualms about finding the assignments that NGL has produced relevant under Rule 26(b)(1). Through the written assignments, three affiliates assigned all claims they have against Eagle to NGL. NGL contends that it produced the assignments only in an abundance of caution to resolve any potential issue regarding standing or capacity. However, the potentiality of such a defense is sufficient to find the assignments relevant for purposes of discovery. Standing, furthermore, may be a jurisdictional issue that a party or the court may raise at any time. *See Turcheck v. United States*, No. 1:16-CV-0061-BL, 2017 WL 5004831, at *2 (N.D. Tex. Oct. 12, 2017) (recommendation of Mag. J.) *adopted by* 2017 WL 5028197 (N.D. Tex. Oct. 30, 2017); *Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2017 WL 3046881, at *4-10 (N.D. Tex. May 25, 2017)

(recommendation of Mag. J.) *adopted by* 2017 WL 3034317 (N.D. Tex. July 17, 2017). Moreover, the assignments appear relevant as to what damages might be recoverable by NGL in this action against Eagle. Similarly, the assignments might affect the amount of damages that could be offset by Eagle's affirmative defenses. Discovery about recoverable damages stemming from asserted claims is undoubtedly relevant and thus discoverable so long as the requested discovery is proportional. The Court need not make any determination regarding proportionality at this point.

Eagle also seeks discovery about the obligations that entities affiliated with NGL have with respect to the railcars at issue in this litigation. The Court likewise has no qualms about finding discovery about these affiliates and their obligations relevant. Documents showing such obligations are relevant to various defenses, including offset, credit, fraud, and accord and satisfaction.

### 3. Rule 30(b)(6) Deposition

A review of the deposition testimony of NGL's representative designated pursuant to Fed. R. Civ. P. 30(b)(6) shows that the representative lacked information necessary to respond to various questions about topics set out in the notice of deposition. The Court finds that *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416 (5th Cir. 2006) provides binding authority regarding the Rule 30(b)(6) issues in this case. Section IV of that opinion addresses Rule 30(b)(6). Before reconvening Walker's Rule 30(b)(6) deposition or deposing a substitute designee, the parties should understand the requirements set out in that case, confer about the proper scope of the topics, and make good faith efforts to resolve NGL's objections to them.

### 4. Disclosure of Interested Persons

Eagle contends that, by failing to disclose its affiliates, NGL has failed to comply with disclosure requirements of Fed. R. Civ. P. 26, as well as requirements of N.D. Tex. L. Civ. R. 3.1(c),

3.2(e), and 7.4. *See* Doc. 57 at 1. First, Fed. R. Civ. P. 26(a) does not require a party to disclose the identities of affiliated entities as a part of its initial disclosures. In pertinent part, Rule 26(a)(1)(A)(i) merely requires disclosure of the identity of "each individual likely to have discoverable information," but only if the disclosing party may use such individual "to support its claims or defenses." Similarly, Rule 26(a)(1)(A)(ii) requires disclosure of documents that the disclosing party may use to support its claims or defenses. Neither rule requires disclosure of witnesses or documents that will be used only for impeachment.

Further, the relevant local rules in a removed case such as this are N.D. Tex. L. Civ. R. 81.1 and 81.2. Nevertheless, LR 81.1(a)(4)(D) required NGL to file "a separately signed certificate of interested persons that complies with LR 3.1(c) or 3.2(e)." LR 81.2 likewise required Eagle to file a similar certificate within twenty-one days after removal unless it adopted a previously-filed certificate. LR 3.1(c) and 3.2(e) both require a "signed certificate of interested persons" that contains (1) "a complete list of all persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal entities that are financially interested in the outcome of the case" and (2) the information required by Fed. R. Civ. P. 7.1(a), i.e., identification of "any parent corporation and any publicly held corporation owning 10% or more of its stock."

NGL filed a corporate disclosure statement to comply with Fed. R. Civ. P. 7.1, but names a different parent company (NGL Energy Operating, LLC) than the one revealed through discovery (NGL Energy Partners, LP). *See* Doc. 2. It also filed a Certificate of Interested Parties (doc. 1-3) that merely lists the parties and their attorneys. Eagle filed neither of these things. It thus appears that both parties have neglected their obligations under applicable rules. Both parties shall promptly

comply with Fed. R. Civ. P. 7.1 and the local rules. Because an organizational chart exists for NGL and its affiliates, the Court orders NGL to file that chart as part of its certificate of interested parties.

### 5. Miscellaneous Matters

In response to the motion to compel, NGL often states that Walker provided testimony relevant to some of the requests for production. *See* Doc. 61 at 9-13. However, the fact that Walker has testified about matters requested in the Second Request for Production does not necessarily supplant the requested documentation. Consistent with the scope of discovery set out in Fed. R. Civ. P. 26(b), parties may seek verification of deposition testimony through proper requests for production. Of course, on a proper showing, such verification may be subject to appropriate limitations on frequency and extent through Fed. R. Civ. P. 26(b)(2)(C).

Eagle has stated that it will accept the burden and expense of sorting through documents responsive to RFP 1 and 2, if NGL produces them as they are kept in the ordinary course of business for its review. Doc. 63 at 3-4. Such an agreement is one way to reduce the financial burden on a producing party and the Court expects Eagle to honor that statement.

### V. SANCTIONS

In addition to sanctions already addressed, both parties seek sanctions with respect to the motions. To the extent that the Court has not specifically addressed requested sanctions, it finds no sanctions warranted on the motions, not only for the reasons already stated, but also because it finds that acts and omissions of both parties have resulted in substantial court filings and have contributed to the need for additional time for discovery and the potential need to re-depose witnesses. Because the Court finds both parties partially responsible for the current posture of this case it specifically declines to sanction either party or apportion any costs and expenses among the parties. Each party

shall be responsible for their own costs and expenses incurred on the resolved motions and any remaining discovery.

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** NGL Crude Logistics, LLC's Objection to and Motion to Exclude Untimely Expert Designations and Opinions (doc. 43); **DENIES** Plaintiff Eagle Railcar Services-Roscoe, Inc.'s Motion for Leave to File Third Party Complaint (doc. 47); and **DENIES** Eagle's Motion to Compel and Motion for Sanctions (doc. 57). The Court hereby extends the expert designation deadline to **January 31, 2018**, and finds Eagle's January 2018 designations timely. In addition, the Court issues the following orders to cure the minimal prejudice caused by the 2018 designation of experts. NGL shall have until **June 21, 2018**, to designate any rebuttal experts. The deadline for discovery is extended to **July 23, 2018**. Eagle shall make its expert witnesses available for depositions, if NGL wants to depose them. The dispositive motion deadline, including any *Daubert* challenge, is extended to **August 22, 2018**. If the parties prefer reasonable extensions of these deadlines, they may confer and submit a joint motion to extend one or more of these deadlines.

**IT IS SO ORDERED this 22nd day of May, 2018.**

**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**